UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RAP INDY, LLC,<br>MSI LYNHURST INDIANAPOLIS<br>GROCERY, LLC, | ) <br> ) <br> ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-04657-JRS-MJD |
| | ) | |
| ZURICH AMERICAN INSURANCE<br>COMPANY,<br>THE TRAVELERS INDEMNITY<br>COMPANY, | ) <br> ) <br> ) <br> ) | |
| | ) | |
| Defendants. | ) | |

**Order on Motions for Summary Judgment (ECF Nos. 118, 123, 126)**

In connection with a shuttered Marsh store that was burglarized and vandalized, Plaintiffs RAP Indy, LLC ("RAP Indy") and MSI Lynhurst Indianapolis Grocery, LLC ("MSI Lynhurst") filed insurance claims with Defendants Zurich American Insurance Company ("Zurich") and The Travelers Indemnity Company ("Travelers"). After Zurich and Travelers denied their claims in part, Plaintiffs sued for breach of contract and breach of the covenant of good faith and fair dealing. Each party now moves for summary judgment. (ECF Nos. 118, 123, 126.) For the following reasons, the motions are granted in part and denied in part.

## I.    Background

MSI Lynhurst owns the property at 35 North Lynhurst Drive in Indianapolis ("Property"), which until 2015 operated as a Marsh grocery store. (Pourteymour Aff.

¶¶ 3–4, ECF No. 118-5.)  MSI Lynhurst is a wholly owned subsidiary of RAP Indy. (*Id*.)  Since Marsh left the premises, the Property has been vacant.

At all relevant times, Colliers International has provided real estate management services for the Property on behalf of MSI Lynhurst.  (*Id*. ¶ 6.)  Those management services included permitting participation in Colliers's insurance program.  (*Id*.)  Thus, the Property was covered by Colliers's policies with insurers Zurich and Travelers.  (*Id*.)  Zurich's policy covered the Property from January 2, 2018, to July 1, 2018.  (ECF No. 118-1 at 759–60.)  Travelers's policy covered the Property from July 1, 2018, to July 1, 2019.  (ECF No. 118-5 at 6.)  These were styled as "all-risk" insurance policies, which provide coverage for all "fortuitous losses unless the loss is excluded by a specific policy provision . . . ."  10A COUCH ON INSURANCE 3d § 148:50.

During a visit in early January of 2018, it was noted that the Property lacked known water damage, and it had not been visibly broken into.  (*See* Galyan Dep. Tr. 50:11–52:10, ECF No. 128-10.)  The rest of 2018 was not a good year for the Property.

The next inspection of the Property occurred on July 20, 2018.  (Jurhs Dep. Tr. 48:16–51:7, ECF No. 145-4; *see generally* ECF No. 145-5 (pictures).)  This was the first discovered loss.  The floor was found strewn with debris, including plumbing insulation indicating that the plumbing system had been removed.  (*Id*.)  A roof hatch had been left open.  (*Id*.)  The roof membrane was visibly "compromised" with several "little gaps in seams."  (Ratliff Dep. Tr. 34:16–17, ECF No. 150-8.)  There was puddled water on the floor, and there was noticeable mold growing inside the building.  (Jurhs Dep. Tr. 48:16–51:7, ECF No. 145-4.)  Much of the electrical system had been stolen.

2

(Ratliff Dep. Tr. 34:11–24, ECF No. 150-8.)  Utility records showed that power ceased transmission at the Property on January 29, 2018, indicating that thieves had apparently dismantled the electrical system on that date.  (Pourteymour Aff. ¶ 8, ECF No. 118-5.)

The second loss was discovered near the end of 2018.  On November 27, 2018, Plaintiffs learned from the Indianapolis Metropolitan Police Department that a break-in had occurred at the Property.  (Pls.' Resp. Travelers's 1st Interrogs. ¶ 3, ECF No. 118-5 at 100.)  On December 4, 2018, the Property was inspected, and a trespasser was found on site.  (*Id.*)  The six HVAC units on top of the roof had been removed. (Ratliff Dep. Tr. 100:12–15, ECF No. 145-3.)  Plaintiffs' expert witness Brian Haden attributes "numerous" punctures in the roof membrane to the thieves' rather crude removal of the HVAC units.  (ECF No. 118-4 at 20.)

For these losses, Zurich and Travelers paid only the following.  On November 30, 2018, Zurich paid $250,000 toward the electrical loss.  (ECF No. 118-5 at 55.)  On December 27, 2018, Zurich paid a further $304,202.58 for the electrical loss, two steel doors and locksets, ceiling grid and tiles, labor, engineering, and rental permits and fees.  (ECF No. 119 at 15.)[1]  On March 7, 2019, Travelers paid $39,854.50 toward the stolen HVAC units.  (ECF No. 118-5 at 56.)  On April 2, 2019, Travelers paid $90,000 for the plumbing losses.  (ECF No. 119 at 16.)  On March 14, 2019, Travelers paid a further $75,000 for the plumbing losses.  (ECF No. 119 at 16.)  Zurich and Travelers

---

[1] The Court cites to Plaintiffs' statement of material facts for this and other propositions only because Plaintiffs, as part of an unfortunate pattern, provided internal recordkeeping citations that the Court cannot further locate in the vast record associated with this case.

denied the other losses that Plaintiffs claimed—most conspicuously, the losses related to the water and mold damage.

On November 22, 2019, Plaintiffs sued Zurich and Travelers for breach of contract and breach of the implied covenant of good faith and fair dealing.  The parties filed cross-motions for summary judgment on various parts of the claims.

Further facts will be discussed below as necessary.

## II.    Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of production.  *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).  That initial burden consists of either "(1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim."  *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citing *Modrowski*, 712 F.3d at 1169).  If the movant discharges its initial burden, the burden shifts to the nonmovant, who must present evidence sufficient to establish a genuine issue of material fact on all essential elements of his case.  *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009).  "The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: [the Court] construe[s] all facts and inferences arising from them in favor of" the nonmovant.  *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017) (citation omitted).

## III.   Discussion

*A. Indiana Law*

When this Court sits in diversity jurisdiction, it applies Indiana substantive law. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).   In Indiana, contracts for insurance are generally "subject to the same rules of interpretation as are other contracts." *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985).   A plaintiff bears the burden of proving (1) that a contract existed; (2) that the defendant breached that contract; and (3) that the breach caused damages. *Kishpaugh v. Odegard*, 17 N.E.3d 363, 375 (Ind. Ct. App. 2014) (citation omitted).

There are, however, some special rules in the insurance context.   "If ambiguity exists, the Court will construe the language strictly against the insurer and in favor of coverage in the case of a dispute between an insurer and an insured." *Union Sav. Bank v. Allstate Indem. Co.*, 830 F. Supp. 2d 623, 630 (S.D. Ind. 2011) (citing *Gallant Ins. Co. v. Amaizo Fed. Credit Union*, 726 N.E.2d 860, 864 (Ind. Ct. App. 2000)).

Additionally, claims arising from all-risk insurance policies may implicate a special burden-shifting procedure, but only if the insurance provider contends that an exclusion to coverage applies.   "The insured has the initial burden of showing the existence of a loss under an "all-risk" policy with the burden then shifting to the insurer to show exceptions to coverage."[2]   10A COUCH ON INSURANCE 3d § 148:52.

---

[2] Citing the burden-shifting rule as to exclusions, Plaintiffs argue *Defendants* must *disprove* that certain alleged causes of loss occurred during the applicable policy periods.   They cite no authority actually stating that strange proposition, which is contrary to caselaw in Indiana and other jurisdictions.   Decades ago, the Eleventh Circuit squarely rejected the rule proposed by Plaintiffs:

However, "[e]ven with an 'all risk' policy, an insured must prove that it has suffered a covered loss before the burden shifts to the insurer to show an exclusion." *Ports of Indiana v. Lexington Ins. Co.*, No. 1:09-CV-0854-TWP-MJD, 2011 WL 5523419, at *9 (S.D. Ind. Nov. 14, 2011). "The time period covered by a policy is a basic element of determining the risk covered by the policy." *United Techs. Auto. Sys., Inc. v. Affiliated FM Ins. Co.*, 725 N.E.2d 871, 874 (Ind. Ct. App. 2000) (citing 7 COUCH ON INSURANCE 3d § 102:1). It follows that the insured must prove that the covered cause of damage occurred within the applicable policy period. 17A COUCH ON INSURANCE 3d § 254:11 (insured must prove as part of prima facie case that "the loss [was] within policy coverage"); *cf. PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 734 (Ind. Ct. App. 2004) ("PSI must prove that subjectively unexpected and unintended contamination continued to cause damage during the relevant policy periods to trigger coverage under these policies.").

## B. Breach of Contract by Zurich

Plaintiffs assert that Zurich breached its insurance policy by failing to reimburse Plaintiffs for "(1) water damage caused by the roof leaks from the latch being left open; (2) mold damage caused by the water damage; (3) debris removal; (4) temporary

---

The plaintiff in a suit under an all-risks insurance policy must show a relevant loss in order to invoke the policy, and proof that the loss occurred within the policy period is part and parcel of that showing of a loss. Rather than being an exception to coverage, as an inherent vice or defect would be, proof that a loss occurred within the policy period is a predicate to the application of the policy.

*Banco Nacional De Nicaragua v. Argonaut Ins. Co.*, 681 F.2d 1337, 1340 (11th Cir. 1982). The Court adopts that reasoning here. Plaintiffs must prove as part of their prima facie case that any given loss occurred within the applicable policy period.

repairs; (5) inflation guard increase; and (6) the plumbing losses."  (ECF No. 119 at 24.)

First, the Court must address Zurich's argument that RAP Indy lacks the right to sue for breach of the insurance policy.  The briefing on this issue—discussing Rule 19 and assignment, among other irrelevant points—was not at all helpful, so what follows is the Court's own research.  "Generally, only those who are parties to a contract or those in privity with a party have the right to enforce the contract." *Daimler Chrysler Corp. v. Franklin*, 814 N.E.2d 281, 285 (Ind. Ct. App. 2004).  Privity has been defined as "mutual or successive relationships to the same right of property, or an identification of interest of one person with another as to represent the same legal right." *Riehle v. Moore*, 601 N.E.2d 365, 371 (Ind. Ct. App. 1992).  MSI Lynhurst is named as an insured entity in the policy, but RAP Indy is not.  (ECF No. 118-1 at 768.)  Thus, RAP Indy may only sue Zurich if RAP Indy is in privity with MSI Lynhurst.  Although the Court cannot find an Indiana case directly stating the proposition, there is broad consensus across jurisdictions that a parent-subsidiary relationship constitutes privity.  *See, e.g., Chung v. Vistana Vacation Ownership, Inc.*, No. CV 18-00469 LEK-RT, 2020 WL 6379272, at *4 (D. Haw. Oct. 30, 2020) (finding privity between parent and wholly owned subsidiary); *Greenberg v. Potomac Health Sys.*, Inc., 869 F. Supp. 328, 330 (E.D. Pa. 1994) (same); *In re Gottheiner*, 703 F.2d 1136, 1139 (9th Cir. 1983) (same); *Martino v. McDonald's Sys., Inc.*, 598 F.2d 1079, 1083 n.7 (7th Cir. 1979) (finding privity between company and its sole shareholder).  This makes sense because a parent company and its wholly owned subsidiary tend to

share analogous legal and financial interests, and persons who control the parent tend to control the subsidiary. That was certainly the case here with Ramin Pourteymour, a managing member of RAP Indy who apparently ran point over most issues regarding the Property. (*Cf.* Pls.' Resp. Travelers's 1st Interrogs. ¶ 1, ECF No. 118-5 at 99.) Accordingly, the Court finds there is privity between RAP Indy and MSI Lynhurst. RAP Indy is a proper plaintiff.

The Court now turns to the merits. Zurich refused to pay for losses (1) and (2)—water and mold damage purportedly stemming from an open roof hatch left open by thieves—because it did not think Plaintiffs proved that the cause of loss occurred during the policy period of January 2, 2018, to July 1, 2018. The relevant facts are as follows. "Probably around early January" of 2018, Courtney Galyan visited the Property and observed no water damage and no evidence of a break-in. (Galyan Dep. Tr. 50:11–52:10, ECF No. 128-10.) According to utility records, the electrical system was cut off on January 29, 2018, at 4:32 a.m. (Pourteymour Aff. ¶ 8, ECF No. 118-5.) However, no one visited the Property again until July 20, 2018, when an open roof hatch, moisture, and mold were discovered in the building. (Jurhs Dep. Tr. 48:16–51:7, ECF No. 145-4.) From this, Plaintiffs ask the Court to find that the only possible inference is that whatever caused the water damage and mold observed on July 20, 2018, occurred during the Zurich policy. The Court must reject that request. There is an obvious continuing dispute of fact over whether the cause of the water and mold happened between January 2 and July 1, 2018. Assuming the cause of water intrusion was the open roof hatch, the Court cannot say the evidence indisputably

points to the hatch opening within the Zurich policy period and not in the three weeks after the Zurich policy expired.[3]   Plaintiffs also claim that, because the dismantled electrical system was likely a "professional job" performed by sophisticated thieves, (ECF No. 145-1 at 45), the only reasonable inference is that the opened hatch occurred at the same time as the dismantled electrical system—January 29, 2018.   But, to the Court, that inference is more speculative than mandatory.   No one can account for what happened at the Property during the Zurich policy period because no one visited the Property between early January and July 20, 2018.   Especially considering the Property's history of break-ins, a jury could find that the roof hatch was left open after the policy period ended.   In sum, there are continuing disputes of material fact as to losses (1) and (2).

Next up is alleged loss (3): debris removal.   The Zurich policy covers "expense to remove debris of Covered Property . . . remaining after a 'covered cause of loss.' . . . The expenses will be paid only if they are reported to us in writing within 180 days of the date of loss or damage."   (ECF No. 118-1 at 309.)   Plaintiffs apparently requested and were allowed $770 for debris removal, though Zurich ultimately did not pay that sum because Plaintiffs did not incur the debris removal cost.   However,

---

[3] It may be appropriate to specifically address why one of Plaintiffs' lines of reasoning is wrong.   Plaintiffs contend that (1) because the Zurich policy period was some six months long and (2) because the open hatch was found just three weeks after the policy period ended, (3) the hatch must have been opened during the policy period.   This logic is flawed.   Imagine a person's house is maintained by two housekeepers.   The person leaves town for a week one Saturday night.   Housekeeper A takes care of the house Sunday through Friday, and Housekeeper B takes care of the house on Saturday only.   If the person were to return the next Sunday and find the house trashed, it is not undisputed that Housekeeper A trashed the house just because Housekeeper A had custody of the house for most of the week.

the provision does not contain a requirement that the debris removal cost be actually incurred. Thus, Plaintiffs are entitled to the $770 debris removal cost as a matter of law.

Loss (4) pertains to temporary repairs. The pertinent policy provision is titled "Expediting Expense" and reads as follows:

> In the event of covered loss of or damage to "real property" or "personal property" at a "premises" or "reported unscheduled premises" directly caused by a "covered cause of loss," we will pay reasonable and necessary additional expenses *you incur* for temporary repair of damage to such "real property" or "personal property" and the additional expenses you incur for expediting the permanent repair or replacement of such damaged property.

(ECF No. 119-1 at 310 (emphasis added).) There is no evidence that Plaintiffs ever made any temporary repairs to the Property. Hence, Zurich is entitled to judgment as a matter of law with respect to costs of temporary repairs.

Plaintiffs' invocation of loss (5)—"inflation guard increase"—is confusing. The inflation guard provision increases Colliers's blanket $350 million limit for all insured properties by four percent each year. (ECF No. 118-1 at 254.) But the claimed damages here come nowhere close to approaching the blanket limit, so the provision is irrelevant to this case. Plaintiffs are not entitled to judgment as a matter of law as to alleged loss (5).

All that is left to address is alleged loss (6), for plumbing. Plaintiffs apparently accepted payments for the plumbing loss from Travelers already. (*See* ECF No. 118-6 at 83–84.) Putting that aside, the only facts Plaintiffs cite to show that the plumbing loss occurred within the Zurich policy period are those it cited in support of losses (1) and (2) occurring within the policy period. As the Court explained above,

10

Plaintiffs overstate the strength of their evidence on timing. Even if a jury *likely* would find that the plumbing loss occurred during Zurich's policy period, the Court cannot say that is the only reasonable inference that can be drawn from the record. It is not a foregone conclusion that the electrical loss and the plumbing loss occurred simultaneously. Thus, there is a genuine dispute of material fact over whether the plumbing loss occurred within the policy period.

In sum, Plaintiffs are entitled to the $770 for (3) debris removal as a matter of law. Zurich is entitled to judgment as a matter of law on the alleged losses under the (4) temporary repair and (5) inflation guard provisions.[4] The remaining parts of the breach of contract claim against Zurich—losses (1), (2), and (6)—must proceed to trial.

### C. Breach of Contract by Travelers

Plaintiffs assert that Travelers failed to pay for the following losses: "(1) electrical supply to the HVAC units; (2) the sixth missing HVAC unit; (3) damages to the roof; (4) water damage caused by the roof leaks from the HVAC units being dragged across the roof; (5) mold damage caused by the water damage; (6) debris removal; (7) safety measures; (8) business losses; and (9) by paying the actual cash value instead of the replacement cost value . . . ." (ECF No. 119 at 28.) The Travelers policy period was from July 1, 2018, to July 1, 2019. (ECF No. 118-5 at 6.)

First, as to unpaid loss (1), Travelers denies that the loss of the electrical supply to the HVAC units can be fully traced to a covered event during Travelers's policy

---

[4] Zurich did not move for summary judgment on any part of the breach of contract claim, but the Court independently grants Zurich partial summary judgment under Rule 56(f)(1). The Court is satisfied that, given the extensive oversized briefing on the motions, the parties have had ample opportunity to address every issue related to alleged losses (4) and (5).

period.  Indeed, one could reasonably infer that the electrical supply to the HVAC units was removed at least in part when thieves dismantled the bulk of the electrical system, presumably on January 29, 2018.  (*See* Pourteymour Aff. ¶ 8, ECF No. 118-5 (electricity shut off on that date).)  That would be during Zurich's policy period, not Travelers's.  Furthermore, HVACi indicated that some of the piping and wires associated with the HVAC units were removed prior to HVACi's investigation.  (*See* ECF No. 150-15 at 4.)  There is therefore a dispute of fact over how much of the HVAC electrical supply loss occurred during Travelers's policy period as opposed to Zurich's.

With respect to loss (2), the sixth stolen HVAC unit, Travelers denies further coverage because it says it already paid for said unit.  The record reflects a payment for six units.  (*See* ECF No. 128-19 at 2–3.)  Plaintiffs seemingly abandoned the idea that the sixth unit was not paid for, as they did not pursue the point further in their reply.  Plaintiffs are not entitled to any further relief as to loss (2).

Alleged losses (3), (4), and (5) can be considered together—they all have to do with damage to the roof, which Plaintiffs say incontrovertibly led to the water infiltration and mold inside the Property.  To clarify, Plaintiffs' theory is not that the roof damage was the sole cause of the water damage.  S*ee supra* Section III.C (discussing unsecured roof hatch as possible cause of water damage).  But Plaintiffs believe that unascertained persons' mid-theft act of dragging the HVAC units across the roof in late 2018 punctured the roof membrane, creating holes that exacerbated the water and mold damage already present within the Property.  Plaintiffs do not say by what proportion the open roof hatch versus the later vandalism contributed to the water

and mold damage.  Of course, that proportion critically matters to divide liability among Defendants.  That division is itself a continuing issue of material fact.  What's more, Travelers has adduced enough evidence such that a jury could reasonably find that at least one exclusion applies.  The Travelers policy provides, "The Company will not pay for loss or damage caused by or resulting from . . . wear and tear or depletion . . . [or] settling, cracking, shrinking, bulging or expansion[.]"[5]  (ECF No. 118-2 at 25–26.)  Travelers points to several opinions that implicate the wear-and-tear exclusion.  First, EFI Global's March 25, 2019 report states, "Inspection did not reveal evidence of damage having occurred to the roofing as a result of reported vandalism."  (ECF 128-20 at 4.)  Considering that stone ballast had apparently been removed from the roof, implying that some kind of repair job had been underway before any theft, EFI Global's impression was that "the roofing assembly had likely been leaking for some time" before the vandalism discovered in late 2018.[6]  (*Id.*)  Additionally, while construction consultant Michael Newman acknowledges some damage due to vandalism, he also opined after inspecting the Property that shrinkage of the roof's ethylene propylene diene monomer ("EPDM") membrane over time "created significant damage that was not related [to] or considered as part of a specific loss event(s)."  (ECF No. 128-31 at 2.)  And Plaintiffs' expert Brian Haden concurs that wind and shrinkage of the EPDM membrane at least partially caused some of the

---

[5] Because discussion of the wear-and-tear exclusion is sufficient to resolve the cross-motions for summary judgment, the Court need not address whether the continuous-leakage or maintenance exclusions in the Travelers policy apply to losses (3), (4), or (5).

[6] Plaintiffs characterize the EFI Global report as "not material" and proceed to impeach its contents.  In doing so, Plaintiffs entirely disregard the Court's obligation to view the evidence in the light most favorable to the non-movant—Travelers.  *See Blow*, 855 F.3d at 797.

water infiltration at the Property.  (ECF No. 128-30 at 2.)  Losses (3), (4), and (5) must go to a jury to sort out how much of the roof damage and resulting water and mold damage came from the vandalism vis-à-vis an excluded cause like wear and tear.  A jury will also need to decide how much of the water and mold damage can be attributed to the open roof hatch as opposed to the punctured roof.

Next is loss (6), concerning debris removal.  The relevant provision states that Travelers "will pay the necessary and reasonable expense incurred by the Insured to remove debris of Covered Property," so long as such expenses are reported in writing within 180 days of the date of direct loss.  (ECF No. 118-2 at 20.)  Plaintiffs say they spent "maybe" $10,000 or $8,000 on removing debris.  (Pourteymour Dep. Tr. 135:16–137:21, ECF No. 150-6.)   Plaintiffs submitted an insurance claim and contractor estimate that included a line item for moving up to seven tons of debris.  (Hays + Sons Estimate ¶ 2, ECF No. 150-10 at 3.)  The total figure attached to that line item is $22,687.50.  (*Id.*)  Plaintiffs' submission of the estimate to Travelers would seem to constitute the required notice.  Travelers did not dispute notice further in its reply.  Plaintiffs are therefore entitled to judgment as a matter of law as to loss (6).  However, since the cost of such debris removal is uncertain given the conflicting figures in the record, the amount owed as to loss (6) must be determined by a jury.

Plaintiffs also ask Travelers to pay for loss (7), the cost of boarding up the Property and replacing locks broken by trespassers.  In a provision titled "Protection of Property," the policy states that Travelers will pay for "necessary and reasonable expenses actually incurred by the Insured to temporarily safeguard Covered Property

14

against the threat of imminent direct physical loss . . . ."  (ECF No. 118-2 at 22.)  Travelers counters that locks and boards are not "temporary" safeguards but permanent ones, and that it received no evidence of such cost being incurred, in any case.  The only evidence adduced on the latter point is Mr. Pourteymour's testimony that Plaintiffs "changed the door locks" but "never got paid for it, even though [they] submitted it for a claim."  (Pourteymour Dep. Tr. 134:7–15, ECF No. 150-6.)  Thus, Plaintiffs have shown that they incurred costs.  As to the temporary-permanent distinction, the Court agrees with Travelers that locks and boards may not perfectly fit the "Protection of Property" provision's language.  Are locks or boards merely "temporary" safeguards, or are they permanent?  Are they both temporary and permanent safeguards?  Do break-ins several months apart constitute "imminent" threats of "direct physical loss"?  The answers could be argued both ways.  However, since Indiana law directs the Court to interpret ambiguities in favor of the insured, *see Union Sav. Bank*, 830 F. Supp. 2d at 630, the Court holds that the temporary-safeguards provision covers new locks as well as boards used for boarding up the property.  Besides, damaged doors and locks are physical damage presumptively covered by an all-risk insurance policy unless the insurer proves an exclusion applies, which Travelers has not done.  For both reasons, Plaintiffs are entitled to judgment as a matter of law regarding loss (7).  Plaintiffs have not said the amount of such loss, so a jury must still determine the damages associated with loss (7).

Loss (8) has to do with business or rental income ostensibly lost due to the Property's suspension of operations.  Travelers argues, *inter alia*, that lost business

15

or rental income as to the Property is too speculative.  In their reply, Plaintiffs ultimately disclaimed any intention of recovering under the business income provision of the Travelers policy.  The Court agrees with Travelers that Plaintiffs have adduced no evidence—for example, of recent rentals of the Property—that could lead to a right to relief under the business income provision.  Thus, Travelers is entitled to judgment as a matter of law with respect to loss (8).

The final issue, as to loss (9), is whether Travelers owes the replacement cost value ("RCV") of what it has paid to Plaintiffs for the stolen HVAC units and the plumbing damage, not just the actual cost value ("ACV").  RCV is the cost to replace a property "as of the time and place of loss, without deduction for physical deterioration, depreciation, obsolescence and depletion . . . ."  (ECF No. 118-2 at 83.)  ACV "means the cost to repair, rebuild or replace the lost or damaged property, at the time and place of the loss . . . less allowance for physical deterioration, depreciation, obsolescence and depletion."  (*Id.* at 85.)  In relevant part, the Travelers policy states,

> The Company will not pay for any loss or damage on a replacement cost basis until the property is repaired, rebuilt or replaced, and then only if such repair, rebuilding or replacement is made as soon as reasonably possible after the loss or damage.  If the property is not repaired, rebuilt or replaced as soon as reasonably possible after the loss or damage, the value of the property will be determined at "Actual Cash Value."  This restriction does not apply to losses less than $25,000.

(*Id.* at 83.)  Given the plain language of the policy, then, Travelers will pay RCV only if two conditions obtain: (1) the insured repairs, rebuilds, or replaces the property, and (2) the repair, rebuilding, or replacement was made "as soon as reasonably possible" after the loss.  Otherwise, Travelers will pay ACV.  It is undisputed that

16

Plaintiffs have made no material repairs to the Property, so neither condition has obtained. Recognizing this, Plaintiffs invoke the equitable principle that its non-performance of the conditions precedent should be excused because Travelers hindered their performance. An illustration of this principle may be found in *Rockford Mutual Insurance Co. v. Pirtle*, 911 N.E.2d 60 (Ind. Ct. App. 2009). Facing policy language similar to that here, the court in *Pirtle* found that the insured homeowner had been hindered from repairing his damaged home because of the insurer's failure to timely advance funds to commence repairs.[7] Accordingly, the court excused the insured's non-performance on the conditions precedent and ordered a RCV payout. *See also Westfield Nat'l Ins. Co. v. Nakoa*, 963 N.E.2d 1126, 1133 (Ind. Ct. App. 2012) (same outcome where insured had not received any funds to start repairs—"not the actual cash value of the loss, not replacement cost, nothing at all"). *But see Novogroder Cos., Inc. v. Hartford Fire Ins. Co.*, No. 2:10-CV-193 RM, 2012 WL 3637602, at *11 (N.D. Ind. Aug. 21, 2012) (insured not excused from similar condition precedent where it "received actual cash value amount at the outset and could have used those funds to repair the property"), *aff'd*, 528 F. App'x 644 (7th Cir. 2013).

According to Plaintiffs, Travelers hindered their performance on the conditions precedent in two ways:

> The principal reason why MSI Lynhurst did not use [ACV] insurance proceeds to repair the Property is because we did not have enough money to repair the

---

[7] The insurer in *Pirtle* eventually paid the ACV, after litigation began, but this was too late to commence repairs, as the property at issue was already in the middle of foreclosure proceedings and had been condemned by the City of Terre Haute. The court considered the insured hindered in his performance of the conditions precedent to obtaining a RCV payout, as the insured was in "a very bad position to start any repairs" once the ACV funds had finally been advanced. 911 N.E.2d at 66.

17

Property to pre-loss conditions.   In addition, representatives from both insurers told me that MSI Lynhurst should not start repairs until both insurers had completed their adjusting.

(Pourteymour Aff. ¶ 14, ECF No. 118-5.)  But this first excuse is disputed.  Travelers *did* advance an initial ACV payment of over $200,000, and Zurich paid another $550,000 for other losses.  (ECF No. 149 at 27.)  Given the advance ACV payments here, this case may be closer to *Novogroder* than *Pirtle* or *Nakoa*.  Those ACV payments appear to have been enough to at least repair the HVAC setup and plumbing using Total Restoration's bids.  (*See* ECF 128-19 ($224,272.00 bid for fixing HVAC and $250,000 bid for fixing plumbing).)  True, Mr. Pourteymour testified that $750,000 was insufficient to begin repairing the Property.  But his testimony lacks corroborating financial records and is thus little more than *ipse dixit*, so a jury could reasonably disbelieve him.  $750,000 is certainly not "nothing at all."  *Nakoa*, 963 N.E.2d at 1133.  The second excuse is also disputed.  Major Ramsey denies ever telling Plaintiffs not to commence repairs until adjustment of the claims finished.[8]  (Ramsey Aff. ¶ 4, ECF No. 128-32.)  To make a long story short, there remain disputes of fact preventing the Court from granting summary judgment to either Travelers or Plaintiffs on loss (9).

To summarize, summary judgment as to liability is granted in favor of Plaintiffs on losses (6) and (7), and summary judgment is granted in favor of Travelers as to losses (2) and (8).  The remaining alleged losses, as well as the issue of damages stemming from losses (6) and (7), must be resolved at trial.

---

[8] Zurich's agent also denies telling Plaintiffs not to begin repairs until Zurich's claim adjustment concluded.  (Swanson Aff. ¶ 2, ECF No. 124-5.)

### D. *Failure to Mitigate*

Plaintiffs seek a declaration that they did not fail to mitigate their damages. "The duty to mitigate damages is a common law duty independent of the contract terms that requires a non-breaching party to make a reasonable effort to act in such a manner as to decrease the damages caused by the breach." *Fischer v. Heymann*, 12 N.E.3d 867, 871 (Ind. 2014) (cleaned up). The burden of proof regarding failure to mitigate lies with the party allegedly in breach. *Id.*

Mr. Pourteymour testified that "some" repairs had been made using the $750,000 Plaintiffs had received from the insurers. (Pourteymour Dep. Tr. 134:3–135:3, ECF No. 150-6.) When pressed, he clarified that these repairs consisted of replacing busted locks, boarding up the Property a couple of times, and ensuring that the exterior of the building did not violate local ordinances. (*Id.*) Plaintiffs have not repaired the roof, covered the holes in the roof, or remediated the water or mold damage within the building. (*Id.*; *see also* Ratliff Dep. Tr. 88:7–22, ECF No. 124-3 (no visible repair work had been done on Property between end of 2018 and August 13, 2020).) Of course, as discussed above with respect to Plaintiffs' entitlement to RCV payments, Plaintiffs argue that they lacked sufficient funds to significantly mitigate damage within the Property. Still, given the meager record on repairs made to the Property and the continuing disputes over how much money was needed to begin repairs, the evidence is not so conclusive such that no reasonable juror could find that Plaintiffs failed to mitigate their damages. Thus, Plaintiffs' request for a declaration to that effect must be rejected.

19

### E. Consequential Damages

Plaintiffs appear to also request a declaration that they are entitled to any consequential damages that they can prove were proximately caused by a breach of contract by either Zurich or Travelers.  That is the law in Indiana:

> A party injured by a breach of contract may recover consequential damages. *Thor Elec., Inc. v. Oberle & Assocs., Inc.*, 741 N.E.2d 373, 381 (Ind. Ct. App. 2000).  Consequential damages may be awarded when the non-breaching party's loss flows naturally and probably from the breach and was contemplated by the parties when the contract was made.  *Thor*, 741 N.E.2d at 381.  The party seeking damages must prove by a preponderance of the evidence that the breach was the cause in fact of its loss.  *Id.*  This generally limits consequential damages to reasonably foreseeable economic losses. *Berkel & Co. Contractors, Inc. v. Palm & Associates, Inc.*, 814 N.E.2d 649, 658 (Ind. Ct. App. 2004).

*Pirtle*, 911 N.E.2d at 67.  To the extent Plaintiffs seek an assurance that the Court will follow Indiana law, the Court can certainly guarantee that.  *See Erie R. Co.*, 304 U.S. at 78 (requiring federal court exercising diversity jurisdiction to follow state substantive law).

### F. Bad Faith

Plaintiffs' remaining claims against each insurer are for bad faith breach of contract.  The insurers move for summary judgment on these claims.

"Indiana law has long recognized that there is a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured."  *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 518 (Ind. 1993).  "Poor judgment or negligence do not amount to bad faith; the additional element of conscious wrongdoing must also be present."  *Colley v. Ind. Farmers Mut. Ins. Grp.*, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998) (citation omitted).  Conscious wrongdoing may include a "dishonest purpose,

20

moral obliquity, furtive design, or ill will." *Id.* The insurer's obligation of good faith
and fair dealing at least includes

> the obligation to refrain from (1) making an unfounded refusal to pay policy
> proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the
> insured; and (4) exercising any unfair advantage to pressure an insured into a
> settlement of his claim.

*Hickman*, 622 N.E.2d at 519. A refusal to pay is unfounded if the insurer "denies
liability knowing that there is no rational, principled basis for doing so . . . ." *Id.* at
520.

Plaintiffs rest their bad faith claims on two expert witnesses' affidavits.
Unfortunately, these affidavits were untimely disclosed. The scheduling order
indicated that any expert testimony proffered in connection with a motion for
summary judgment had to be disclosed to opposing counsel "no later than 90 days
prior to the dispositive motion deadline." (ECF No. 28 at 4.) After several
postponements, the dispositive motion deadline was set at January 22, 2021. (ECF
No. 110 at 2.) Thus, expert disclosures related to summary judgment had to be
disclosed by October 24, 2020. Plaintiffs disclosed the Fey and Warfel reports on
February 5, 2021. Thus, the expert disclosures were late, and Plaintiffs must
demonstrate good cause. *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified
only for good cause and with the judge's consent."). "In making a Rule 16(b) good-
cause determination, the primary consideration for district courts is the diligence of
the party seeking amendment." *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir.
2011). Plaintiffs offer no reason for the late disclosures, let alone a good reason.

Accordingly, the Court cannot consider the Fey and Warfel opinions for summary judgment purposes.

Beyond those expert opinions, Plaintiffs offer no citations to the record in response to Defendants' motions for summary judgment on the bad faith claims. An independent search of the record, which the Court has no obligation to undertake in the first place, *see* S.D. Ind. L. R. 56–1(h), does not reveal conduct approximating "conscious wrongdoing," *Colley*, 691 N.E.2d at 1261. Had Don Mitchell conclusively denied coverage because of Plaintiffs' purported noncompliance with the Travelers policy's waived vacancy clause, that might have been more than negligent. But Mitchell promptly acknowledged his mistake with respect to the clause and withdrew the initial denial of Plaintiffs' claims. (Mitchell Dep. Tr. 47:3–11, ECF No. 128-13.) Nor does Mitchell's alleged suspicion (which he denies having) that the claims were an "inside job" amount to conscious wrongdoing by Travelers. Neither "the Indiana Supreme Court nor the Indiana Court of Appeals has recognized a claim for bad faith claims *handling*." *Telamon Corp. v. Charter Oak Fire Ins. Co.*, 179 F. Supp. 3d 851, 856 (S.D. Ind. 2016) (emphasis added), *aff'd*, 850 F.3d 866 (7th Cir. 2017). The Court sees no other evidence in the record potentially evincing bad faith by Travelers.

Likewise, there is scant evidence of bad faith by Zurich. Never afraid of overstating the strength of their evidence, Plaintiffs urge that Zurich's denials of coverage were wholly unfounded. As the Court has already explained, however, there are genuine disputes of fact over many of the alleged losses for which Zurich denied coverage. *See supra* Section III.B. Denying coverage when an insured did not clearly

prove that the cause of loss occurred within the policy period is not conscious wrongdoing.

By citing no admissible evidence, Plaintiffs have not met their burden of proof as the nonmovants on the bad faith claims.  In addition, the Court's own search of the record—which it had no duty to undertake—turned up no conduct by either defendant amounting to bad faith.  The bad faith claims must therefore fail.

## IV.   Conclusion

The cross-motions for summary judgment, (ECF Nos. 118, 123, 126), are each **granted in part** and **denied in part**.  For purposes of accounting, the Court will again borrow Plaintiffs' framing of their breach of contract claims.  (*See* ECF No. 119 at 24, 28.)  As to Zurich, these parts of Plaintiffs' breach of contract claim must proceed to trial: (1) water damage; (2) mold damage; and (6) plumbing.  Plaintiffs are entitled to partial summary judgment as to (3) debris removal (in the amount of $770).  Zurich is entitled to partial summary judgment as to (4) temporary repairs and (5) inflation guard increase, so those parts of the breach of contract claim are **dismissed with prejudice**.  As to Travelers, these parts of Plaintiffs' breach of contract claim must proceed to trial: (1) electrical supply to the HVAC units; (3) roof damage; (4) water damage; (5) mold damage; and (9) replacement cost value.  Plaintiffs are entitled to partial summary judgment on liability as to (6) debris removal and (7) safety precautions, though a jury must decide the damages associated with both losses.  Travelers is entitled to partial summary judgment as to (2) the sixth HVAC unit and (8) business and rental income, so those parts of the breach of contract

claim are **dismissed with prejudice**.  Plaintiffs are not entitled to a declaration that they did not fail to mitigate damages.  To the extent Plaintiffs seek a declaration that the Court will follow Indiana law as to consequential damages, the Court can assure Plaintiffs that it will.  Plaintiffs' claims for breach of the covenant of good faith and fair dealing are **dismissed with prejudice**.

Finally, the parties should note that their citations to the record in the briefs here were awfully sloppy—replete with filler text that was never updated before submission, internal recordkeeping citations like "TRAV 321" and "RAP_INDY 17494" that the Court has no way to reasonably decipher, citations to irrelevant documents, and citations to irrelevant page numbers or no page numbers at all.  Any of these mistakes would be understandable coming from a *pro se* litigant, but not from a law firm.  The parties are directed to carefully familiarize themselves with Rule 56(c)(1), Local Rule 56–1, and the practices and procedures concerning form and citation.  If such careless work is submitted in the future, the Court will not hesitate to strike noncompliant filings or issue appropriate sanctions pursuant to Local Rule 1–3.

**SO ORDERED**.

Date: 6/14/2021

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution to registered parties of record via CM/ECF.

24